**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL BRAVE, Individually and On Behalf of All Others Similarly Situated,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　　　v.<br><br>ARCONIC INC., KENNETH J. GIACOBBE and KLAUS KLEINFELD,<br><br>　　　　　　　　　　Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  **Case No.**<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Michael Brave ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Arconic Inc. ("Arconic" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.　　This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Arconic securities between

1

February 28, 2017 and June 26, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Arconic Inc. is a global provider of lightweight multi-material solutions, focused on the aerospace market in addition to serving the automotive, industrial gas turbine ("IGT"), commercial transportation, and building and construction markets. The Company also provides titanium, aluminum, nickel-based super alloy, and specialty alloy solutions.

3. The Company is headquartered in New York, New York. Arconic's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "ARNC."

4. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Arconic knowingly supplied its highly flammable Reynobond PE (polyethylene) cladding panels for use in construction; (ii) the foregoing conduct significantly increased the risk of property damage, injury and/or death in buildings constructed with Arconic's Reynobond PE panels; and (iii) as a result of the foregoing, Arconic's public statements were materially false and misleading at all relevant times.

5. On June 14, 2017, a fire broke out at the 24-story Grenfell Tower apartment block in London. The fire burned for roughly 60 hours, destroying the building and causing at least 80 deaths and over 70 injuries.

6. On June 24, 2017, *The New York Times* published an article entitled "Why Grenfell Tower Burned: Regulators Put Cost Before Safety", describing the causes of the Grenfell Tower fire and attributing the rapid spread of the fire to the highly flammable Reynobond PE cladding panels manufactured by Arconic. The article stated, in relevant part:

> The facade, installed last year at Grenfell Tower, in panels known as cladding and sold as Reynobond PE, consisted of two sheets of aluminum that sandwich a combustible core of polyethylene. It was produced by the American manufacturing giant Alcoa, which was renamed Arconic after a reorganization last year.
>
> Arconic has marketed the flammable facades in Britain for years, even as it has adjusted its pitch elsewhere. In other European countries, Arconic's sales materials explicitly instructed that "as soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material." An Arconic website for British customers said only that such use "depends on local building codes."
>
> ***
>
> Fire safety experts said the blaze at Grenfell Tower was a catastrophe that could have been avoided, if warnings had been heeded.
>
> ***
>
> For more than a week after the fire, Arconic declined repeated requests for comment. Then, on Thursday, the company confirmed that its flammable polyethylene panels had been used on the building.

7. On that same day, Reuters published an article entitled "Arconic knowingly supplied flammable panels for use in tower: emails," revealing that Arconic sales managers were aware that flammable panels would be distributed for use at Grenfell Tower.

8. On June 26, 2017, Arconic issued a press release announcing it would discontinue global sales of Reynobond PE for use in high-rise buildings after the material was suspected to have contributed to the spread of the deadly fire at the Grenfell Tower apartment complex in London.

9.      On these disclosures, Arconic's common share price fell $3.70, or 14.49%, to close at $21.84 on June 27, 2017.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

13.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Arconic's principal executive offices are located within this Judicial District.

14.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15.     Plaintiff, as set forth in the attached Certification, acquired Arconic securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16. Defendant Arconic is incorporated in Pennsylvania, with principal executive offices located at 390 Park Avenue, New York, NY 10022. Arconic's shares trade on the NYSE under the ticker symbol "ARNC."

17. Defendant Kenneth J. Giacobbe ("Giacobbe") has served as the Company's Chief Financial Officer ("CFO") and Executive Vice President since November 1, 2016.

18. Defendant Klaus Kleinfeld ("Kleinfeld") served as the Company's Chief Executive Officer ("CEO") from May 2008 until his resignation on April 17, 2017.

19. The defendants referenced above in ¶¶ 17-18 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

20. Arconic Inc. is a global provider of lightweight multi-material solutions, focused on the aerospace market in addition to serving the automotive, industrial gas turbine ("IGT"), commercial transportation, and building and construction markets. The Company also provides titanium, aluminum, nickel-based super alloy, and specialty alloy solutions.

### Materially False and Misleading Statements Issued During the Class Period

21. The Class Period begins on February 28, 2017, when Arconic filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2016 (the "2016 10-K"). For the quarter, the Company reported a net loss of $1.24 billion, or $2.89 per diluted share, on revenue of $2.96 billion, compared to a net loss of $701 million, or $1.64 per diluted share, on revenue of $2.99 billion for the same period in the prior year. For 2016, the Company reported a net loss of $941

million, or $2.30 per diluted share, on revenue of $12.39 billion, compared to a net loss of $321 million, or $0.93 per diluted share, on revenue of $12.41 billion for 2015.

22. In the 2016 10-K, the Company stated, in relevant part:

Management also recognizes its responsibility for conducting the Company's affairs according to the highest standards of personal and corporate conduct. This responsibility is characterized and reflected in key policy statements issued from time to time regarding, among other things, conduct of its business activities within the laws of the host countries in which the Company operates and potentially conflicting outside business interests of its employees. The Company maintains a systematic program to assess compliance with these policies.

23. The 2016 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, stating that the financial information contained in the 2016 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

24. On April 25, 2017, Arconic issued a press release and filed a Current Report on Form 8-K with the SEC, announcing certain of the Company's financial and operating results for the quarter ended March 31, 2017 (the "Q1 2017 8-K"). For the quarter, Arconic reported net income of $322 million, or $0.65 per diluted share, on revenue of $3.19 billion, compared to net income of $16 million, or $0 per diluted share, on revenue of $3.05 billion for the same period in the prior year.

25. On May 1, 2017, Arconic filed a current report on Form 10-Q with the SEC, reporting in full the Company's financial and operating results for the quarter ended March 31, 2017 (the "Q1 2017 10-Q"). The Q1 2017 10-Q reiterated the financial and operating results previously announced in the Q1 2017 8-K.

26. The Q1 2017 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2017 10-Q was

accurate and disclosed any material changes to the Company's internal control over financial reporting.

27. The statements referenced in ¶¶ 21-26 were materially false and misleading because defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) Arconic knowingly supplied its highly flammable Reynobond PE cladding panels for use in construction; (ii) the foregoing conduct significantly increased the risk of property damage, injury and/or death in buildings constructed with Arconic's Reynobond PE panels; and (iii) as a result of the foregoing, Arconic's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

28. On June 14, 2017, a fire broke out at the 24-story Grenfell Tower apartment block in London. The fire burned for roughly 60 hours, destroying the building and causing at least 80 deaths and over 70 injuries.

29. On June 24, 2017, *The New York Times* published an article entitled "Why Grenfell Tower Burned: Regulators Put Cost Before Safety", describing the causes of the Grenfell Tower fire and attributing the rapid spread of the fire to the highly flammable Reynobond PE cladding panels manufactured by Arconic. The article stated, in relevant part:

> The incineration of Grenfell Tower on June 14, the deadliest fire in Britain in more than a century, is now a national tragedy. The London police on Friday blamed flammable materials used in the facade for the spread of the blaze and said the investigation could bring charges of manslaughter. Hundreds of families were evacuated from five high-rises that posed similar risks.
>
> Flames consumed the tower so quickly that arriving firefighters wondered if they could even get inside. People trapped on the higher floors screamed for their lives through broken windows. At least 79 people died, a toll that is expected to rise as

more bodies are recovered. Survivors have charged that the facade was installed to beautify their housing project for the benefit of wealthy neighbors.

***

The facade, installed last year at Grenfell Tower, in panels known as cladding and sold as Reynobond PE, consisted of two sheets of aluminum that sandwich a combustible core of polyethylene. It was produced by the American manufacturing giant Alcoa, which was renamed Arconic after a reorganization last year.

Arconic has marketed the flammable facades in Britain for years, even as it has adjusted its pitch elsewhere. In other European countries, Arconic's sales materials explicitly instructed that "as soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material." An Arconic website for British customers said only that such use "depends on local building codes."

***

Fire safety experts said the blaze at Grenfell Tower was a catastrophe that could have been avoided, if warnings had been heeded.

***

When the refrigerator on the fourth floor burst into flames, the fire ignited the flammable cladding and shot up the side of the building. The London police confirmed that on Friday and identified the refrigerator brand as Hotpoint. But experts who saw footage of the blaze had known the culprit at once. "You can tell immediately it's the cladding," said Glenn Corbett, an associate professor of fire science at John Jay College of Criminal Justice in New York.

***

[S]ubcontractor, Omnis Exteriors, said on Friday that it had not been told that the flammable Reynobond cladding was going to be combined with flammable interior insulation. That was a problem, the firm said in a statement, adding that the cladding "should only be used in conjunction with a noncombustible material."

The cladding itself was produced by Arconic, an industry titan whose chief executive recently stepped down after an unusual public battle with an activist shareholder. Arconic sells a flammable polyethylene version of its Reynobond cladding and a more expensive, fire-resistant version.

In a brochure aimed at customers in other European countries, the company cautions that the polyethylene Reynobond should not be used in buildings taller than 10 meters, or about 33 feet, consistent with regulations in the United States

8

and elsewhere. "Fire is a key issue when it comes to buildings," the brochure explains. "Especially when it comes to facades and roofs, the fire can spread extremely rapidly."

A diagram shows flames leaping up the side of a building. "As soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material," a caption says.

But the marketing materials on Arconic's British website are opaque on the issue.

"Q: When do I need Fire Retardant (FR) versus Polyethylene (PR) Reynobond? The answer to this, in part, depends on local building codes. Please contact your Area Sales Manager for more information," reads a question-and-answer section.

For more than a week after the fire, Arconic declined repeated requests for comment. Then, on Thursday, the company confirmed that its flammable polyethylene panels had been used on the building.

30.  On that same day, *Reuters* published an article entitled "Arconic knowingly supplied flammable panels for use in tower: emails," revealing that Arconic sales managers were aware that flammable panels would be distributed for use at Grenfell Tower. The article stated, in relevant part:

> LONDON (Reuters) - ***Six emails sent by and to an Arconic Inc (ARNC.N) sales manager raise questions about why the company supplied combustible cladding to a distributor for use at Grenfell Tower, despite publicly warning such panels were a fire risk for tall buildings.*** The emails, dating from 2014 and seen by Reuters, were between Deborah French, Arconic's UK sales manager, and executives at the contractors involved in the bidding process for the refurbishment contract at Grenfell Tower in London, where 79 people died in a blaze last week.
>
> When asked about the emails, Arconic said in a statement that it had known the panels would be used at Grenfell Tower but that it was not its role to decide what was or was not compliant with local building regulations.
>
> The company manufactures three main types of Reynobond panel-- one with a polyethylene (PE) core, one with a fire retardant core and another with a non-combustible core, according to its website.
>
> Diagrams in a 2016 Arconic brochure for its Reynobond panels describe how PE core panels are suitable up to 10 meters in height. Panels with a fire resistant core -- the FR model -- can be used up to 30 meters, while above that height, panels with the non-combustible core -- the A2 model -- should be used, the brochure says.

Grenfell Tower is more than 60 meters tall.

The brochure also issued a blunt warning that cladding can be a fire risk.

"When conceiving a building, it is crucial to choose the adapted products in order to avoid the fire to spread to the whole building. Especially when it comes to facades and roofs, the fire can spread extremely rapidly," the brochure said.

"As soon as the building is higher than the fire fighters' ladders, it has to be conceived with an incombustible material." Nonetheless, between May and July 2014, French, who was based at Arconic's factory in Merxheim, France, responded to requests from the companies involved in refurbishing Grenfell Tower on the availability of samples of five different types of Reynobond aluminum-covered panels, all of which were only available in the combustible PE and FR versions, according to Arconic brochures.

In the end, Arconic said on Friday, the company provided PE panels. "While we publish general usage guidelines, regulations and codes vary by country and need to be determined by the local building code experts," the company said in an emailed statement in response to the Reuters enquiry.

\*\*\*

French did not respond to requests for comment.

Arconic, which was known as Alcoa Inc until 2016, declined to say if it knew how tall the tower was and the emails seen by Reuters do not specifically refer to its height. They do, however, refer to "Grenfell Tower" and mention other high rise projects where paneling has been used when discussing the appearance that was being sought for Grenfell Tower.

***Arconic also knew the quantity of panels being supplied and thus the total exterior coverage. A source at one of the companies involved in the process said Arconic had "full involvement" throughout the contract bidding process.***

Omnis Exteriors, which cut the Arconic tiles to shape and supplied them to the cladding contractor, said it was not responsible for the choice of panel.

"CEP played no part in the selection of Reynobond PE and simply fulfilled the order as directed by the design and build team," the company said in a statement on Saturday, referring to CEP Architectural Facades Ltd, the Omnis unit which fulfilled the contract.

\*\*\*

In the emails, French and representatives of Harley and Rydon also discuss the choice of panel models and colors and how they were inching towards securing the contract with the local authority.

10

> Harris did not respond to requests for comment.
>
> On Sunday, British finance minister Philip Hammond said the type of panels used, which are cheaper than non-combustible panels, were banned for use in high rise buildings in Britain, as they are in Europe and the United States.
>
> ***
>
> The fatal fire was started by a faulty Hotpoint fridge-freezer in one of the apartments, London police said on Friday. Detective Superintendent Fiona McCormack said insulation on the building, and the ***cladding panels, had failed safety tests carried out after the disaster.***
>
> ***The police investigation was considering the possibility of manslaughter and criminal offences in respect of the fire.***

(Emphasis added.)

31.     On June 26, 2017, Arconic issued a press release announcing it would discontinue global sales of Reynobond PE for use in high-rise buildings after the material was suspected to have contributed to the spread of the deadly fire at the Grenfell Tower apartment complex in London.

32.     On this news, Arconic's common share price fell $3.7% or 14.48% over two trading days, to close at $21.84 on June 27, 2017.

33.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

34.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Arconic securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are defendants

herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

35. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Arconic securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Arconic or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

36. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

37. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

38. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;
- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Arconic;

- whether the Individual Defendants caused Arconic to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Arconic securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

39. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

40. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Arconic securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Arconic securities between the time the defendants failed to disclose or misrepresented

material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

41. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

42. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

43. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

44. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

45. During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and

other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Arconic securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Arconic securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

46. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Arconic securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Arconic's finances and business prospects.

47. By virtue of their positions at Arconic, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

48. Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers

and/or directors of Arconic, the Individual Defendants had knowledge of the details of Arconic's internal affairs.

49. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Arconic. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Arconic's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Arconic securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Arconic's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Arconic securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

50. During the Class Period, Arconic securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Arconic securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff

and the Class, the true value of Arconic securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Arconic securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

51. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

52. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

### COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

53. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

54. During the Class Period, the Individual Defendants participated in the operation and management of Arconic, and conducted and participated, directly and indirectly, in the conduct of Arconic's business affairs. Because of their senior positions, they knew the adverse non-public information about Arconic's misstatement of income and expenses and false financial statements.

55. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Arconic's

financial condition and results of operations, and to correct promptly any public statements issued by Arconic which had become materially false or misleading.

56.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Arconic disseminated in the marketplace during the Class Period concerning Arconic's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Arconic to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Arconic within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Arconic securities.

57.     Each of the Individual Defendants, therefore, acted as a controlling person of Arconic. By reason of their senior management positions and/or being directors of Arconic, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Arconic to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Arconic and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

58.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Arconic.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 13, 2017

    Respectfully submitted,

    **POMERANTZ LLP**

    */s/ Jeremy A. Lieberman*
    Jeremy A. Lieberman
    J. Alexander Hood II
    Hui M. Chang
    600 Third Avenue, 20th Floor
    New York, New York 10016
    Telephone: (212) 661-1100
    Facsimile: (212) 661-8665
    Email: jalieberman@pomlaw.com
          ahood@pomlaw.com
          hchang@pomlaw.com

    **POMERANTZ LLP**
    Patrick V. Dahlstrom
    10 South La Salle Street, Suite 3505
    Chicago, Illinois 60603
    Telephone: (312) 377-1181
    Facsimile: (312) 377-1184
    Email: pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*